Good morning. Allison Wajardo on behalf of Mr. Achey. May it please the court, counsel. The grand jury charged Mr. Achey with conspiracy to distribute tetrafentanyl and 4-ACO-DMT, but the government did not prove that conspiracy existed. Mr. Achey's conviction on count one should therefore be reversed. His case remanded for further proceedings. This court's case is recognized that the grand jury may charge a specific conspiracy or a generic one. The example of the specific conspiracy is Narog, which is cited and discussed in the briefs. This looked to me like a Sanders indictment. And these are the distinctions with Sanders, Your Honor, of Mr. Achey's indictment. Mr. Achey's indictment has two paragraphs. The first paragraph charges or defines the crime, what conspiracy is being charged. And the language that the first paragraph uses is that Mr. Achey did conspire to distribute and possess with the intent to distribute a controlled substance analog that was intended for human consumption. And I'll emphasize this, which violation involved tetrafentanyl and 4-ACO-DMT. This first paragraph is defining the crime. But, I mean, we used the indictment, and Sanders also used that involved language, and we said that it charged the generic, right? And the reason Sanders charged the generic is because the first portion of that indictment alleged that there was the conspiracy to knowingly and intentionally distribute a controlled substance. That was the generic allegation. The involving language goes on to define the apprendee enhancement. But that's true here, right? And here's the distinction. The involving language in Sanders is the apprendee enhancement. The involving language in Mr. Achey's case is the definition of the crime. The penalty of this first paragraph of the indictment is zero to 20 years. This is the charged crime under the statutes. It's a conspiracy to distribute the named substances of tetrafentanyl and 4-ACO-DMT. It's not the apprendee enhancement, which is the involving language in Sanders. So this indictment said it charged him with distributing and possessing with intent to distribute a controlled substance analog that was intended for human consumption, right? That's generic. Except that goes on, and this is still the definition. Which involved, right? That's the same kind of language as Sanders. It is, except for in this context, and I'll explain why I'm reading it this way. In this context, in Mr. Achey's indictment, this first paragraph is defining the charged conspiracy. It's not the penalty provision like the involving language in Sanders under apprendee because it's not until the second paragraph of Mr. Achey's indictment that the penalty enhancement is charged. So the first paragraph is defining the crime, and we know that too because this is exactly how the government presented its definition of the conspiracy to the jury. In closing argument, and I'll refer to document 91 at page 30. This is the government's closing argument. The unlawful purpose of that plan was to distribute or possess with intent to distribute the two controlled substances we've been talking about in this case. And at the outset of the government's closing argument, page five of the same transcript, it says the two substances are tetrafentanyl and four ACODMT. It seems to me that the Narag situation though is that the indictment charged that the defendant with conspiring to possess and intent to distribute, knowing that the listed chemical would be used to manufacture a controlled substance that is meth, right? Methamphetamine. Correct. And ours is like that. But this isn't. I mean, this is which involved isn't the that is meth. It is in this context because in our first paragraph, it is the allegation is that the analog intended for human consumption, but the analog uses which rather than that. But it's which violation. We're defining the violation. It's involving tetrafentanyl and four ACODMT. And the reason it's unlike Sanders is Sanders uses the involving as it relates to the apprendee enhancement portion of the indictment. Our indictment, and in fact, this is where the penalty, now I'll refer to the second paragraph of Mr. Aikie's indictment. This is where our indictment just reinforces that the defined charged conspiracy is as to the tetrafentanyl is because Mr. Aikie is charged specifically with distributing and possessing with intent to distribute. That is, now that is the same language in NAROG. So that is the tetrafentanyl because that's the substance that he is alleged to have distributed and conspired to distribute that resulted in the death. So taken together, our indictment charges a very specific conspiracy. Two substances, and then the penalty provision does so as well as it relates to the tetrafentanyl in particular. In this case, the problem then is that the government did not prove the charged conspiracy, and I think at this point I'd like to reverse. I know I started earlier explaining the indictment as to the overall charged conspiracy, but I'd like to start with the insufficiency as to the death conspiracy, and that is because, and just to point this out, I pointed out earlier just the conspiracy alone is zero to 20 years, but the death is a 20-year minimum mandatory to the maximum of life. And as we have laid out in the briefs, the government did not prove, did not provide sufficient evidence that Mr. Aikie conspired with somebody else to distribute the tetrafentanyl that caused the death. Well, what about LS? Because my understanding of the record is that Mr. Aikie told law enforcement that he directed the Chinese suppliers to ship in small increments to avoid law enforcement detection. Why isn't that evidence of more than purchases? Your Honor, this court's case law does recognize that a buyer-supplier relationship does not constitute a conspiracy. That's right, but it seems to me that this goes beyond that, that evidence. I mean, this was not a one-man operation, right? I mean, so he's getting 100 orders a day. He's paying others to break it down in larger shipments into smaller shipments. He works with a reseller to whom he directed customers who wanted to purchase smaller quantities. There's no question that there's evidence here about his wife being involved. There's evidence of a conspiracy with someone, isn't there? The problem lies with the lack of evidence as to a conspiracy or an agreement with respect to the specific substances. So the reseller, that's a different substance for PHP, I believe it was. The wife, there's no evidence that she's in a conspiracy as it relates to the charged substances. I'd still submit as to the . . . Well, let's say if this is a Sanders situation and not an Iraq situation, then what you're saying is there is evidence of a conspiracy? If it's a generic conspiracy? Yeah. Your Honor, I would submit that there may be as to the underlying overall conspiracy, which is a 0 to 20, but not as to the death conspiracy. I think the government would still have to prove a specific conspiracy to conspire with someone with respect to the tetrafentanyl that caused the death. It wouldn't have to be that leads to the death. It wouldn't have to be that the person with whom he conspired knew that someone was going to die. May I respond to that? Sure. Yes, Your Honor. In this case, though, all the evidence, and this is laid out in the briefs, is that Mr. Aikie himself distributed the drugs. What's missing as to the death is the conspiracy, the agreement as to that tetrafentanyl. May I go back to my question? With respect to the Chinese supplier, and I understand that that relationship did involve the tetrafentanyl. Why is that not sufficient, the fact that the supplier was told to ship in smaller increments to avoid detection? Your Honor, I have to tell you I don't recall that testimony, so that's why I'm a little bit struggling because I know as it's been briefed. It was in what Mr. Aikie said to law enforcement in his interview. It would be okay if I just review that statement and address that in my rebuttal? Thank you. Good morning, Your Honors. May it please the Court. Sean Siakinen for the United States. You're exactly correct that this is a Sanders indictment, but at the end of the day, that doesn't matter because I think the government did prove the charged indictment even under Mr. Aikie's view of Count 1, and there are a few things that I'd like to address. First, turning to Judge Pryor's point about LS Research Chem Lab, I think they certainly were the most significant and the most pervasive of the individuals or entities with whom Mr. Aikie conspired, and there are several points in the record that illustrate this and that would have supported a reasonable inference that the jury could have drawn that Mr. Aikie was involved in a conspiracy to distribute controlled substance analogs, including the two alleged in Count 1, in February 2017 at the time that the THF fentanyl charged in that count killed Christina Gorman. The first point, as you mentioned, Your Honor, was that in Government Exhibit 2, Mr. Aikie told DD, who was the individual who testified at trial, about how he had originally sold his Eddie King Alphabet username to Mr. Aikie. DD, Mr. Aikie told DD in his online dark web alphabet messaging that he, quote, got some THF fentanyl from LS in January, being January 2017. That was a month before Mr. Aikie admits that he personally distributed the THF fentanyl to Jonathan Heracek that subsequently killed his fiancee, Christina Gorman. So from that alone, I think the jury reasonably could have inferred a conspiracy at that date. Well, but that might be a buyer-seller relationship, a single transaction. So how is this different? What pushes it over the line? Well, I think there's also the other evidence from Mr. Aikie's post-arrest statement that you mentioned previously, Your Honor. Mr. Aikie made very clear to the investigating agents that he frequently ordered large quantities, large distribution quantities, of controlled substance analogs exceeding a kilogram, and he asked his supplier to break it up into multiple shipments because he knew that, or at least he thought that a kilogram was a, quote, magical weight that would be automatically seized by customs, but smaller packages would not. And he further told DEA that sometimes his supplier did this, sometimes they didn't,  and that customs had seized several packages. And not only that, but in that same interview, Mr. Aikie further explained that when he received chemicals from LS, he sent them to Spain to be tested for purity, quote, all the time, every time. Again, making clear that his involvement with LS Research Chem Lab was not an isolated one-off transaction involving a small quantity of drugs as suggested in Mr. Aikie's appellate briefs. In addition, there's also forensic computer evidence that further illustrates the nature and the extent of Mr. Aikie's relationship with his Chinese supplier, the LS Research Chem Lab. And there are two things on that point. If you look at Government Exhibit 38, which is the forensic evidence regarding his computer, his Internet web browser that was recovered after his arrest, rows 694 to 716 on the Internet history tab of that spreadsheet show that he had visited various pages on the LS Research Chem Lab website hundreds of times, including as recently as two days before he was arrested. And then going to the length of time that he had had this relationship with LS, if you look at row 172 of the bookmarks tab of Exhibit 38, you'll see that he originally bookmarked the LS Research Chem Lab website on July 23, 2015, almost two years before he was arrested. So again, on appellate review, the standard is whether the evidence viewed in the light most favorable to the jury's verdict could support the reasonable inference of a conspiracy in February 2017 as charged in the indictment. And I think for those reasons that the evidence could reasonably support the jury's verdict. The jury heard evidence about how AlphaBay facilitated Mr. Aikie's transactions, but it seems to me you never presented to the jury or argued on appeal that AlphaBay was a co-conspirator. Is that right? Well, AlphaBay was a large dark web marketplace, for lack of a better word. AlphaBay was not an individual. My understanding is that AlphaBay was the name of the website, as it were, on which this Eddie King store or sub-marketplace existed. DD, who was the individual who transferred the Eddie King username to Mr. Aikie in July 2016, had originally set that username up or registered it on the AlphaBay dark web site or marketplace, if you'd like to think about it that way. No, we would not argue that AlphaBay, the website or the marketplace, was itself a co-conspirator, although I think there is evidence in the record from DD's testimony and from Mr. Aikie's own statements, which is in Exhibit 6.1 in his post-arrest interview, that Mr. Aikie was also conspiring with DD to distribute drugs, including fentanyl analogs, on the AlphaBay marketplace using the Eddie King username. Am I right that it's pretty settled in this circuit that all the evidence had to show was that the defendant conspired with someone? Yes. He doesn't have to identify with particularity who that would be? Right. And there's plenty of evidence here in this record that he was at least conspiring with his wife, right? I think the jury reasonably could have inferred that, in addition to conspiring with LS Research Chem Lab and with DD. I don't see where there's really any dispute raised in his brief about that, insofar as what the jury could have inferred of him conspiring with his wife. I don't know that Mr. Aikie disputes that, but at the end of the day, Your Honor, I think the problem— That'd be it. That's the end of the game, isn't it? Well, I think the problem with Mr.— one of the biggest problems with Mr. Aikie's argument at bottom  over and over again with each individual transaction. And that's clearly not the law, getting to Your Honor's point. A defendant's involvement in a drug distribution conspiracy, which the jury clearly could have inferred based on this evidence, continues unless and until he affirmatively withdraws from the conspiracy or abandons it. And if a defendant claims to have done so, that's his burden to prove. This is the Harrison case in 2003, among others. And in this case, there is no evidence to suggest that Mr. Aikie ever abandoned or withdrew from the conspiracy. To the contrary, the evidence— Is there any evidence that the wife was ever involved with the tetrafentanyl? I don't know, Your Honor. I don't believe that the wife was charged. I do know that the record does reflect that agents observed his wife dropping packages off at the post office at least five days out of the six days, that they were observing her. And there's also evidence in the record to suggest that when Mr. Aikie was arrested at his home, that the home appeared to be an open controlled substance analog processing and distribution and shipping warehouse, for lack of a better word. And there are photographs in some of the exhibits. I apologize, I don't have those particular exhibit numbers in my notes. But there is, I think, significant evidence in the record from which the jury could have inferred that. So it seems to me then your argument may rise or fall on whether or not it's a Sanders conspiracy. If it is, then there is clear evidence, maybe even overwhelming evidence, of the existence of a conspiracy and the defendant's participation. If it's a NAROG conspiracy, then there may be something else. No, Your Honor, I think that that's actually a red herring, because even if the indictment is read in that manner, as Mr. Aikie suggests, even if this court were to view it as a NAROG conspiracy or charge, the evidence nonetheless supports the reasonable inference that Mr. Aikie Would you review that for me, please? Sure. The evidence, and the questions this court would then need to address is whether it was reasonable for the jury to infer that the THF fentanyl that Mr. Aikie admittedly personally distributed to Christina Gorman in February 2017, and her fiance, whether it was part of the ongoing conspiracy. That's really what the issue would be, assuming that this was a NAROG indictment. And I think that was a reasonable inference based on Mr. Aikie's own statements in his post-arrest interview, which we've discussed. These are Exhibit 6.1, ages 38, 89 to 99, 39, 13 to 17. Are you suggesting that we should make that assumption? I'm sorry, what assumption, Your Honor? That it is a NAROG indictment. I'm suggesting that the court need not address that, because the evidence in this case That was not my question. If you want to look at this in the cleanest, easiest way to resolve the case based on the record, what should we say? I think this court should say that the jury reasonably could have inferred from the evidence a conspiracy that existed in February 2017 with respect to the particular substances alleged in that count. Is it a Sanders or a NAROG? Is that a hard question? No, I think it's a Sanders allegation. That makes it a lot easier, doesn't it? Yes, that's one way that this court could resolve this case. Maybe I'm missing something, but it seems to me that's just an elementary thing. We look at the indictment and NAROG and Sanders and we say, which is it? And if it is a Sanders, this is very easy, isn't it? Yes, I agree, and I think it's easy either way, I guess is what I would say. I do agree that it's a Sanders allegation for the reasons that we've discussed, but the point that I was making was that this court would not need to address that because the evidence was sufficient to support the reasonable inference of a conspiracy at the date charged in that count with respect to the particular substances charged in that count. But what about with respect to the enhancement? As your opponent argues, is it still a Sanders or does it have to be specific to that drug? With respect to that enhancement, yes, I do think we were required to prove distribution of that particular drug, and we did so. If your honors have no further questions. But I didn't understand that there was really an argument about the sufficiency of the proof for the enhancement. Is there? I'm sorry, an argument about? The sufficiency of the proof for the enhancement as opposed to how the conspiracy was charged and proved. I don't think that there's a reasonable dispute. I'm just trying to make sure I understood what issues were actually before us. It's not entirely clear to me what Mr. Akey is arguing. I did take his brief to argue that the evidence was insufficient with respect both to the conspiracy conviction in count one and also with respect to the enhancement. OK. I disagree with both of those arguments. OK. But I'm not entirely clear what he's arguing. OK. Fair enough. Thank you, Your Honor. Who would ask that Mr. Akey's conviction be affirmed? Just to be clear, we are contending that the evidence is insufficient as to both the first paragraph of the indictment and the death enhancement. So I think at the very least, and the government just agreed, it would have had to have proven a conspiracy to distribute the tetrafentanyl that resulted in the death. And most certainly, we are contending the government did not submit sufficient evidence as to that specific conspiracy. So at a minimum, the enhancement should be reversed. Now, obviously, I'm still maintaining that the entire count one should be reversed. But at a minimum, the enhancement should be reversed. Now, and that leads then to what is the evidence the government's relying on with respect to both the enhancement and even the underlying conspiracy with respect to the tetrafentanyl? And this goes back to the question about LS. I had read Mr. Akey's statement earlier on. He's asked about where do you get the tetrafentanyl? He identifies LS chem. He says he bought it a little bit. And then, in fact, there's also a communication with the original Eddie King. This is Government's Exhibit 2. He got some tetrafentanyl from LS in January. And in April, when this communication happens, he says he still has 15 grams. And then I'll go back to the statement. And this is back at Government's Exhibit 6.1. He told the agents he got the tetrafentanyl from just that one place. They don't make it anymore. They had it for a limited time. And I just bought a little bit, and that was it. I had understood Mr. Akey's later. This is what I think I was asked about in the opening. Bates number 3926 of the Government's Exhibit 6.1. He's asked about how do you communicate with your suppliers, plural. This discussion I did not understand to be specific to tetrafentanyl. So when he's asked about how he ships, you know, shipping less than a kilo, I did not take and did not understand this discussion to be specific to LS or the tetrafentanyl. So I think what I would still maintain is the Government did not submit sufficient evidence of a conspiracy with Mr. Akey and someone else to distribute the tetrafentanyl that caused the death. So at a minimum, the enhancement would need to be reversed. We'll maintain that position. But even as to the overall conspiracy, obviously we've maintained that this first paragraph of the indictment is an Arag conspiracy. That's what we're maintaining, and that the Government, even as respect to the wife, the wife, there's no evidence that she was involved in the specific conspiracy charged. So that's where the evidence is lacking. And the Government told the jury, you know, we have to prove the conspiracy, that the unlawful object of the plan, the agreement, was as to these two substances. And so we are maintaining that the Government has not proven either the overall conspiracy or the conspiracy related to the death enhancement predating the death. And that's one of the issues, of course, as well, is some of the evidence the Government relied upon post-dates February 2017, but the only operative conspiracy that's charged with respect to the enhancement of Count 1 has to predate February 2017 when the death occurs. Thank you. Thank you. We'll go to our last case, Austin v. United States.